IN RE APPLICATION OF PETROLEUM TRANSPORT COMPANY ET AL.

PETROLEUM TRANSPORT COMPANY ET AL., APPELLANTS, V. ALL CLASS I RAIL CARRIERS IN NEBRASKA, APPELLEES.

114 N. W. 2d 34

Filed March 30, 1962. No. 35090.

*Nelson, Harding & Acklie, Donald E. Leonard,* and *Robert S. Stauffer,* for appellants.

*Harvey L. Goth,* for appellees.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

This is an appeal from an order of the Nebraska State Railway Commission, hereinafter referred to as the com-

mission, which denied the applications of the Petroleum Transport Company, formerly Basin Truck Company, and Vernon Lloyd Miller Trucking, Inc., for authority to transport cement in bulk as common carriers between points in Nebraska over irregular routes. The two applicants have appealed and the cases have been briefed and heard together.

The matter was previously before this court in Basin Truck Co. v. All Class I Rail Carriers, 172 Neb. 28, 108 N. W. 2d 388, since which time the Basin Truck Company by reorganization has become the Petroleum Transport Company. Vernon Lloyd Miller Trucking, Inc., has since the filing of the original application succeeded to rights of Vernon Lloyd Miller, the original of one of the two applicants.

In Basin Truck Co. v. All Class I Rail Carriers, *supra,* this court held that the orders of the commission previously entered would be set aside because of irregularity in failing to make findings of fact. After the mandate of the court was lodged with the commission it entered new orders, dated April 28, 1961, reciting the fact of the appeal and decision of the court and containing findings which, with respect to the Petroleum Transport Company, Inc., were as follows:

"1. Petroleum Transport Company (Basin Truck Company) is fit, willing and able properly to perform the service proposed and to conform with the provisions of Section 75-222 to 75-250, R. R. S. 1943 as amended and the Rules and Regulations of the Commission thereunder.

"2. The service proposed is not required by the present or future public convenience and necessity.

"3. Since the proof is found wanting on the issue of public convenience and necessity, the application should be denied."

After these findings appears the order which again denies the application in substantially the same language as the order set out in the previous opinion. A separate order was entered on the application of Vernon

Lloyd Miller Trucking, Inc., differing practically in name only.

From these new orders both Petroleum Transport Company and Vernon Lloyd Miller Trucking, Inc., have perfected appeal to this court. They will be referred to hereafter as the applicants, or separately as Petroleum or Miller.

The applicants' assignments of error, so far as need be considered by this court, are that the orders of the commission are arbitrary, unreasonable, and contrary to the law and the evidence, and that the commission failed to consider the inherent advantages of motor transportation over rail transportation.

Protests to granting the applications were filed by Chicago, Burlington & Quincy Railroad Company; Chicago and Northwestern Railway Company; Chicago, Rock Island and Pacific Railroad Company; Missouri Pacific Railroad Company; and Union Pacific Railroad Company, who are the appellees herein. For convenience they will be designated as the railroads except where separate mention becomes necessary.

The applicants make objection to the new findings of the commission because there was no rehearing before the commission supplied them. The evidence had been taken previous to the first appeal. The applicants had been heard before the commission. The commission had made its decision and informed the applicants of it. The previous orders were invalid because the findings required by section 84-915, R. S. Supp., 1959, were not set out in the order. This court reversed the previous order for lack of such findings. Where an order of the Nebraska State Railway Commission is reversed by this court for lack of findings and at the time of receiving the mandate the commission has before it sufficient evidence on which to base findings that will sustain its decision, it may do so without notice or rehearing.

In Young v. Morgan Driveaway, Inc., 171 Neb. 784, 107 N. W. 2d 752, this court held that an order of the

commission making ultimate findings in the language of the statutes is a sufficient compliance with the commission's statutory obligation.

We find no merit in the objections to the findings if they were sustained by the evidence before the commission.

It now becomes necessary for us to review the evidence in the proceeding before us. Before doing so we state certain rules pertinent to this case. The following are set out in Preisendorf Transp., Inc. v. Herman Bros., Inc., 169 Neb. 693, 100 N. W. 2d 865: "The burden is on the applicant for a certificate of public convenience and necessity to show that he is fit, willing, and able to perform the service he proposes; that he will conform to the provisions of sections 75-222 to 75-250, R. R. S. 1943, and the requirements, rules, and regulations of the commission promulgated thereunder; and that the proposed service is or will be required by the present or future public convenience and necessity.

"On an appeal to the Supreme Court from an order of the Nebraska State Railway Commission, administrative or legislative in character, the only questions to be determined are whether the commission acted within the scope of its authority and whether the order complained of is reasonable and not arbitrarily made."

The commission found that the applicants were both fit, willing, and able to properly perform the service proposed and to conform with the applicable laws and rules and regulations of the commission. Those questions are not before us. The only question presented to this court is whether the finding of the commission that the proposed service is not required by the present or future public convenience and necessity is either arbitrary or unreasonable under the evidence.

Both applicants seek authority to transport cement in bulk, in tank or hopper type vehicles. The more modern trucks engaged in such carriage are covered. The cement hauled by them on delivery is generally

pumped out by means of an auger or other type of automation and run either into storage or machines engaged in mixing cement for immediate use.

Applicant Petroleum is a Colorado corporation engaged in transportation of crude oil, fracturing oil, and other products required in servicing oil wells in Nebraska, Wyoming, and Colorado. It has authority as a motor carrier to transport these commodities in intrastate commerce in Nebraska, and similar intrastate authority in the states of Colorado and Wyoming. It has a terminal in this state at Kimball, Nebraska. Applicant has extensive equipment engaged in that service. It has power units that can be utilized in the new service and proposes to acquire any other necessary equipment if the authority is granted. It has never before transported cement either in bulk or bags. It proposes to operate from its present terminal at Kimball, Nebraska.

The applicant Miller has authority to transport cement in bulk in interstate commerce from the vicinities of Laramie, Wyoming, Boettcher, Colorado, and Rapid City, South Dakota, to points in Nebraska west of State Highway No. 27, and is engaged in such carriage. Its representative testified if the applicant was successful in securing the statewide intrastate authority requested in the application it would also service cement plants at Superior and Louisville, Nebraska, which, from the record, appear to be the only commercial cement manufacturers in this state. The contemplated service would include transportation from rail sites in Nebraska to the job site, and directly from the cement plants to various consignees at designated destinations. The witness testified that in oil wells a great amount of cement is used, most of which is more economically furnished in bulk, although for small jobs and finishing the well, sacked cement is used.

Aside from the representatives of the applicants who testified largely as to their fitness to undertake the service, there were only two supporting witnesses for the

applicants. Tom Birdsall was camp head for Halliburton Oil Well and Cementing Company at Sidney, Nebraska. His company is engaged in servicing the oil industry, including cementing and fracturing oil wells which he supervises in the field. The company has a bulk storage facility for cement at Kimball which is served with cement both by rail and truck. It has eight of its own cement trucks with which it transports cement to the wells and it intends to keep them. Halliburton carries on its principal business in Cheyenne, Banner, Morrill, and Kimball Counties, but has also worked in Red Willow, Richardson, and Hitchcock Counties, although that work is minor in volume. In the past it has on occasion used its trucks to haul cement from Cheyenne County to the southeastern part of the state. The company has no competition in the eastern part of the state because there are no oil wells there. The company's own equipment has been insufficient in boom times, though it has always been able to service its work. In some instances it would have been cheaper to hire a common carrier. It had never purchased cement at Superior or Louisville. Time is vital in oil well work and if cement is purchased in sacks they must be cut, which requires extra help, expense, and time.

Roy Garten of Garten & Garten, Inc., general contractors, with offices in Cheyenne, Wyoming, testified the company constructed heavy structures, mostly bridges, in Wyoming and Colorado. It has bid on jobs in Nebraska but has never secured a contract in this state. It has used the services of Miller in other states which have been satisfactory. Transportation costs are material in bidding and it is to a contractor's advantage to have cement delivered in bulk direct to the job site. Nearly 95 percent of its work is off rail. If it sets up a "batching plant" of its own on the job it is sometimes from $2 to $3 a yard cheaper. Whether it is cheaper to haul from the cement plant or rail head depends on the distance involved. The witness considered truck trans-

portation of bulk cement a little faster, although he
had never incurred delays in rail service. He testified
the company would use Miller on any work it might have
in Nebraska if authority were granted.

The protestants in opposing the granting of the au-
thority introduced a number of witnesses. They were
representative of two classes. There were nine wit-
nesses of companies engaged in selling cement products.
Most of them operated Ready Mixed plants and some
manufactured cement blocks or other cement products.
The secretary-treasurer of Nebraska Sand, Gravel and
Ready Mixed Concrete Association testified his associa-
tion represented 22 cement concerns and that there were
between 40 and 50 such operators in the state. All the
witnesses testified their companies were against grant-
ing the applications. They were all located on railroads
and received their cement by rail, most of which comes
from the cement plants at Louisville or Superior. They
based their position largely on three factors. They
were equipped to take cement by means of an auger
from a position under the railroad tracks where it was
dumped by specially-built covered dump cars and they
maintained new facilities would have to be built to ac-
commodate trucks. They had been given 6 days without
demurrage by the railroad on cars and in many in-
stances the cement could be processed from them with-
out being put through storage. During rains it was left
a few days in the cars. They fear if cement is trans-
ported by motor carrier it might jeopardize rail service
to them, some of whom are located on branch lines.

The other witnesses were representatives of the rail-
roads involved. From exhibits introduced by them
cement appears to be an important item of rail trans-
portation, in some instances being the tenth or fourteenth
item of traffic from the standpoint of revenue. From
January to September 1959, the Chicago, Burlington &
Quincy Railroad Company handled 1,619 cars of cement
originally at Louisville, and 2,196 cars from Superior, all

bound to points in Nebraska. From August 1, 1958, to July 31, 1959, the Missouri Pacific Railroad Company handled 2,614 cars originating at Louisville, and 539 cars from Superior with a gross revenue of exactly $532,394, all of which were shipments terminating in Nebraska. No good purpose will be served by an extended discussion of all the statistics which in varied form were presented by each railroad. All these protestants have built at great expense large numbers of covered hopper cars and they are anxious to hold the business. In many instances they are faced with falling revenues, and are opposed to granting the applications.

Paul Hakes, owner of Ready Mixed Concrete Company at Sidney, Nebraska, testified on rebuttal that his plant at Sidney uses both rail and truck service and finds both satisfactory and needed by his company. The trucks that served it come from Laramie, Wyoming.

No representatives of either of the companies manufacturing cement at Superior or Louisville appeared or testified at the hearing.

This was in substance the evidence before the commission when, pursuant to the mandate of this court, it found that the proposed service was not required by the present or future public interest. Applicants contend that this finding is arbitrary and unreasonable under the facts disclosed by the record. They assert that it is shown that in certain instances of off-rail work sites the transportation of bulk cement by motor carrier is essential; that the railroads cannot deliver it to such locations and that it is necessary for public convenience; and the new service will not seriously impair the cement business of the railroads. They claim the Ready Mixed operators who object to the requested service are all located on rail sites and are joining with the railroads to create for themselves a monopoly of the cement business generally with a like monopoly of its carriage in the railroads.

In Neuswanger v. Houk, 170 Neb. 670, 104 N. W. 2d 235, this court stated: "In determining the issue of public convenience and necessity, in cases where new or extended operating rights are sought, controlling questions are whether the operation will serve a useful purpose responsive to a public demand or need; whether this purpose can or will be served as well by existing carriers; and whether it can be served by applicant in a specified operation without endangering or impairing the operations of existing carriers contrary to the public interest."

The first requirement of this "yardstick," as it is termed in the cited case, is whether the operation will serve a useful purpose responsive to a public demand or need. The testimony of the applicants on this feature lacks persuasiveness. Of the supporting witnesses for the applicants, one was connected with an oil well servicing company which had eight cement trucks of its own and which would require independent motor carrier service only on rare occasions in boom times. The major portion of its work was in counties in the immediate vicinity of Sidney which area was serviced by cement trucks from Laramie. It has always managed locally with its own equipment. The other witness represented an out-of-state contractor who had never been awarded a contract in Nebraska. It could never have utilized the service in the past and it is questionable whether it could do so in the future. The Ready-Mixed company concerning which the rebuttal witness testified is served by cement trucks from Laramie in interstate commerce. To what extent the new service would be used by any of them is speculative.

The evidence offered by the protestants was to a great extent aimed primarily to show that the service could be performed by existing carriers and that the authorization of new competition might endanger or impair the operations of existing carriers. It did however also tend to throw light on whether or not the new

operation would serve a useful purpose responsive to a public demand or need. It is perhaps significant also that no manufacturers of cement in Nebraska, who are the primary shippers, supported either application. The burden of showing a public demand or need is upon the applicants.

The duty of making the decision on the question of whether the operation would serve a useful purpose responsive to a public demand or need is upon the commission and not the court. Our review on appeal is to determine whether or not the commission acted arbitrarily or unreasonably and we are unable to find that it did with the evidence before it.

It follows that the order of the commission must be affirmed.

AFFIRMED.

SIMMONS, C. J., participating on briefs.